## Ryder License

*John McD. Sharpe, Sr.,* for appellant.

*Paul F. Mower,* for Secretary of Revenue.

DEPUY, P. J., July 30, 1962.—Richard D. Ryder, on April 11, 1962, filed his appeal from an order of the Secretary of Revenue suspending his operating privilege for a period of nine months on the basis of his conviction of a charge of involuntary manslaughter in the court of oyer and terminer of this county on February 9, 1962.

Counsel and the court have agreed that all evidence received at the trial of Ryder for involuntary man-

slaughter in September, 1961, as recollected by all concerned, shall be considered as before the court in the present appeal, plus a small quantity of evidence received at the recent hearing of June 12, 1962.

From all that evidence, we make the following:

## Findings of Fact

1. The operator, Richard D. Ryder, is 19 years of age and resides at the farm of his parents on R. D. 1, Newburg, two and one-half miles from the village of Roxbury.

2. At the time of the accident, the occupation of Ryder was cutting paper wood some four miles from his home. More recently, he has been engaged in construction work in the building of the new Interstate Highway No. 81 through this county. He works about 15 miles from his home, and there is no public transportation. He drives a car which he has recently purchased and would suffer economic hardship if the suspension is allowed to stand.

3. On May 30, 1961, at about 5 p.m., with weather dry and clear, Ryder was operating his brother's vehicle without any passenger and was returning home from the sawmill where he worked.

4. The Ryder vehicle was approaching a right-angle stop intersection at a State highway.

5. At the same time, one Maurice Mentzer was operating another motor vehicle on a downhill grade on the said State highway approaching, from Ryder's left, the same intersection. Mentzer had John B. Wenger as a passenger.

6. As Ryder approached the intersecting highway, he faced a stop sign. From the evidence it could be inferred that he had stopped but had felt obliged to bring his car close enough to the intersecting principal highway that his front bumper was on or over the edge of the said highway for the purpose, according to Ryder, of get-

ting a view to his left past a high bank of earth there, with vegetation flourishing upon the bank.

7. Whether Ryder stopped for the stop sign or not, and regardless at what point in his approach he stopped, he came out on the highway in the face of the Mentzer vehicle when he had no right to do so, and the collision resulted.

8. Both Mentzer and his passenger, Wenger, were killed as a result of the collision.

9. Ryder was prosecuted for involuntary manslaughter, pleaded not guilty and was convicted by a jury on September 20, 1961. He filed a motion for a new trial, which made it necessary that the official reporter transcribe the record of the trial (actually never transcribed). When Ryder's insurance carrier settled the death claims of Mentzer and Wenger, the motion for new trial was withdrawn on February 2, 1962.

10. On October 19, 1961, after the manslaughter trial and verdict, Ryder was called before a Department of Revenue examiner at Chambersburg for hearing.

11. Ryder testified before the examiner that he was convicted on the charge and that his motion for a new trial was pending.

12. Ryder later received a notice from the Secretary of Revenue that under section 618, paragraph (b) (4), of The Vehicle Code, his license was suspended for a period of 30 days beginning in November 1961.

13. After the conviction, the clerk of courts of Franklin County in routine manner forwarded to the Department of Revenue at Harrisburg a certification of Ryder's conviction.

14. On February 9, 1962, the court of oyer and terminer passed sentence on Ryder as follows:

"The sentence of the Court is that you pay the costs of prosecution, pay a fine of $200.00 and undergo imprisonment in the Franklin County Jail for a period

of not less than 2 nor more than 12 months to be computed from February 2, 1962."

15. Ryder served two months in prison under his sentence and was released on 12 months parole. His fine and costs total $437.75, which he is paying on the installment plan under the order of parole.

16. On April 5, 1962, Ryder was notified by the Secretary of Revenue that his license had again been suspended, this time under section 618(a)(3) of The Vehicle Code, effective from April 12, 1962.

### Discussion

The scope of the duty of the court of common pleas on a license suspension appeal is indicated by The Vehicle Code of April 9, 1959, P. L. 58, sec. 620, 75 PS §620, where it is said that the court at the hearing shall take testimony and examine into the facts of the case to determine whether petitioner's operating privilege is "subject to suspension". A hearing de novo must be held on the facts. The court is not to substitute its judgment for that of the Secretary of Revenue, but merely to decide whether, on the evidence presented, a violation of The Vehicle Code did occur. If it did, then in the absence of important mitigating circumstances, the suspension must be sustained: Commonwealth v. Emerick, 373 Pa. 388. The court is not permitted to increase or reduce the period for which the secretary suspended the license: Oesterling Appeal, 347 Pa. 241, 243.

It seems clear that for an appellant to succeed, the court would have to find by a preponderance of evidence (a) that a violation did not occur, or (b) if a violation did occur, that there existed such attenuating circumstances as will justify setting aside a suspension.

The Secretary of Revenue in his original suspension of Ryder for a period of 30 days relied on section 618-

(b) (4) of the code which provides that the secretary after hearing may suspend whenever the secretary finds upon sufficient evidence "That such person was operating any motor vehicle or tractor involved in an accident resulting fatally to any person."

The second suspension by the secretary, this time for nine months, was made under section 618(a) (3) of The Vehicle Code which provides that the secretary may suspend the operating privilege of any person, with or without a hearing, upon receiving a record of proceedings in which such person was found guilty by a judge and jury, or whenever the secretary finds upon sufficient evidence "That such person has been convicted of manslaughter resulting from the operation of a motor vehicle or tractor."

The question raised by Ryder's appeal petition is whether, after the Secretary of Revenue, being in full possession of all the facts involved in a specific violation of the law, in this instance facts involving manslaughter, and being possessed of knowledge that a conviction by a jury had ensued, and after the secretary has previously, under an appropriate section of the code (section 618(b) (4)) suspended the operator's license for 30 days, the secretary may later on, without any additional supervening facts, and basing his action on the same conduct on the part of the operator that was the basis for the first suspension, order an additional suspension of nine months.

The operator correctly argues that, regardless of the language of The Vehicle Code, the mere fact that one is operator of a motor vehicle that is involved in a fatal accident could not, under the constitutional right of due process, give the Secretary of Revenue the right to suspend an operating privilege. An accident could be fatal without any act of irresponsibility whatever on the part of one or several operators.

Before the question of suspension of license is reached, there must be a showing of fault on the part of the operator. Further than that, it must be shown that such negligence arose to such a grave level that, for the protection of the public, so formidable a deprivation of the incidents of citizenship in a free country as is a license suspension ought to be imposed: Levengood Appeal, 377 Pa. 301; Commonwealth v. Bushey, 368 Pa. 67; Commonwealth v. Cole, 350 Pa. 369.

The right of appeal is given to the holder of an operator's license in order that the court may review the case de novo and, if the facts and law warrant, may take such action as necessary to protect the defendant from arbitrary exercise of power on the part of the Secretary of Revenue: Handwerk Automobile License Case, 348 Pa. 263.

The right of the secretary to suspend the license of Ryder because of the fatal accident and after conviction by a jury on the charge of involuntary manslaughter is not questioned. The initial suspension by the secretary, based on the present set of facts, could have been longer than 30 days, and petitioner or this court could hardly have considered any change in that disposition.

But, after the secretary, with full knowledge of all important facts in the case, took action under The Vehicle Code to suspend the operator's license, for whatever period, can the secretary later, based on exactly the same facts, order an additional suspension of nine months?

The language of double jeopardy, belonging to the criminal courts, has not, so far as we know, been applied in administrative proceedings, in case of suspension of a vehicle operator's privilege or otherwise. There is no excuse for confusing the English language or the law by importing into the administrative area the criminal language of double jeopardy, a term of

precise meaning. But the reasoning behind the rule of double jeopardy and behind the rule of res judicata is well known and is fundamental in our, and in any other, fair system of jurisprudence.

The Commonwealth argues that this case is ruled by the decision in Upsey v. Secretary of Revenue, 193 Pa. Superior Ct. 466. There, Upsey, before his criminal case was decided, had his license suspended under section 618(b)(1) for operating under the influence of intoxicants.

Upon conviction, his license would have been revoked under the mandatory language of section 616 (a)(1). The court in the Upsey case said:

"He contends that the legislature did not intend to have both of these penalties (revocation under §616, supra, and suspension under §618, supra) imposed for the same offense.

"Double penalties are not per se unconstitutional, or even unusual. A person found guilty of the crime of operating a motor vehicle while under the influence of intoxicating liquor must pay costs of his prosecution, and can be sentenced to pay a fine, and to serve a prison term and can have his operator's license revoked for one year—all for a single violation."

The court held that imposition of the two penalities by the secretary did not constitute double jeopardy under article I, sec. 10, of the Pennsylvania Constitution, nor did it violate due process under the fourteenth amendment of the Federal Constitution. We draw attention, however, to the fact that everything depends, as usual, on definition. The phrase "double penalties" lacks something in precision.

Because an Amerian lives under two sovereignties, as most American citizens do, if he indulges in some prohibited activity, it may give rise to two separate criminal offenses, as frequently occurred during the prohibition era. The courts then realized and decided

that both the Federal and State criminal jurisdictions could properly impinge upon a citizen, and that on the same set of facts an offender could be convicted of violating the Federal law about alcohol, and also could be convicted under a similar State law, without being able to interpose the plea of double jeopardy. In our view, this situation ought not, in precise use of legal language, be considered to result in a "double penalty".

In similar vein, a good many other situations can be imagined where, under some aspect of our jurisprudence, an individual may by a single action on his part fall afoul of the criminal code and, at the same time, have certain administrative consequences, for example in the case of a hunting, fishing or motor vehicle license suspension.

We think such a series of government sanctions doesn't properly fall under the terminology of "double penalty". These are different penalties, imposed by different jurisdictions or withdrawing different privileges, impinging in different ways upon the bundle of rights which, according to Hohfeld and others, would constitute the global "incidents" of citizenship or residence in this free country. The fact that the courts can properly approve the imposition of a number of sanctions of one sort or another upon the same individual, arising from the same factual transaction, does not, in our view, make possible the present effort of the Secretary of Revenue to impose the same identical kind of sanction coming from the same branch of government in the same sovereignty upon Ryder. We don't think a "double penalty" in this sense can be constitutionally applied to one motor vehicle operator.

We think there is a differentiation between the facts of the Upsey case and those of the present case. Here, the examiner, when holding the hearing of October 19, 1961, was in possession of all the facts that the secretary was in possession of later when the second sus-

pension was imposed. Defendant had already been convicted at the time the first examiner's hearing was held. The fact that a certain amount of red tape had not transpired, whereby the clerk of the courts would submit to the Secretary of Revenue a notice of the conviction, cannot be regarded as giving rise to any new fact inimical to the operator.

Without speaking about the rule of double jeopardy or due process under the fourteenth amendment, or of res judicata, it seems clear to us that any court in the land must be ever concerned about judicial or administrative conduct of government which has any reasonable likelihood of bringing the operations of government into disrepute. It would be difficult, if not impossible, to explain to the ordinary citizen of moderate intelligence how the secretary could make two successive dispositions on the same set of facts in the present matter. No amount of finely spun reasoning ought, we think, to stand in the way of elemental logic or fairness to the citizen.

The power of the Secretary of Revenue is plenary. It is not good for him to become straitjacketed by a system of even his own standard penalties, no matter how valuable or essential such a system is, so that when he is, in the first instance, ordering a suspension, he does not order one that is carefully calculated in relation to the facts then known, in all their significance. There is no reason other than one having to do with red tape that could justify the secretary in suspending Ryder's license after the hearing of October 19, 1961, without suspending it for whatever total period was needed in order to cope adequately with the gravity of the facts of the particular case.

The courts ought not to consecrate or place their seal upon a procedure that will not stand up in the scales of fairness in the long run. What possible excuse is there for the secretary to have a second shot at Ryder

in the present set of facts when the secretary already had full opportunity at the first hearing to act definitively in the matter?

Reports of procedures in parts of the State reach us from time to time, and we conclude from them that the Secretary of Revenue is for good reason reluctant, in carrying out his duties in the area of license suspensions, to rely entirely upon the certification to him of convictions or guilty pleas by clerks of court in certain counties. Because of extraordinary delays in bringing cases to trial at times or of unexplained lack of certification of conviction to the Secretary of Revenue, the secretary must, in the public interest, be empowered to impose a suspension irrespective of the outcome of criminal proceedings in those counties. However, it is hard to see any reason why he should have a second shot at any given case.

If the secretary's first suspension is justified at all, it should be justified in plenary aspect. In cutting off a dog's tail, it has long been held there is no merit in cutting it off in pieces. On a different plane, it is well known there is no such thing as one being a little pregnant. Pregnancy is definitive, yes or no. Suspension of license ought to be the same way.

We can see no possible justification for a suspension of 30 days or for any other period on the part of the Secretary of Revenue based merely on the fact of an operator being "involved in a fatal accident." If this method is employed in the Table of Standard Penalties, it can hardly be justified. If an individual, drunk or otherwise, were to step out between two cars in front of an operator late at night, he could easily be killed. There could be no justification for imposing a suspension upon the operator.

How can one escape the logic that if Ryder was involved in a fatal accident and was at fault, this would furnish the only ground for the secretary to suspend

even for 30 days, and the fact that Ryder was convicited of manslaughter by a jury would not make him any more at fault than he was before the conviction.

Now, July 30, 1962, the action of the secretary in suspending the operating privilege of Richard D. Ryder is set aside and the privilege is ordered restored. Because the statutes make no provision for imposition of costs against the Commonwealth, it is ordered that the operator pay the costs of this proceeding. Exception granted to the Commonwealth.